In Gun CHOE, Petitioner,

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 91–70443.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1993.

Decided Dec. 14, 1993.

**926**

Stephen A. Johnston, and Daniel H. Smith, MacDonald, Hoague & Bayless, Seattle, WA, for petitioner.

Francesco Isgro, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: WRIGHT, ALARCON, and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Reverend In Gun Choe has lived in the United States as a legal permanent resident since 1982. In 1988, however, the Immigration and Naturalization Service ("INS") began deportation proceedings against Choe. The Immigration Judge terminated the proceedings; the Board of Immigration Appeals ("BIA") reversed the decision of the Immigration Judge and ordered Choe deported.

The INS claimed that when Choe entered the United States as a nonimmigrant he had a preconceived intent to remain in the country permanently. The BIA found that this preconceived intent rendered Choe excludable at his time of entry; the BIA also held that Choe's adjustment of status did not affect this improper entry.

Choe petitioned us for review of the BIA decision. Because we find that adjustment of status bars later deportation for initial entry with preconceived intent to remain, we grant the petition for review and remand the action to the BIA for termination of deportation proceedings.

**I**

A. *Choe's Immigration History*

Reverend In Gun Choe is the Pastor of Philippi Presbyterian Church in Seattle, Washington. Choe is a native of Korea and attended theological seminary in Korea. In December 1981, the Consular Section of the American Embassy in Seoul, Korea issued a B–2 visitor's visa to Choe. The nonimmigrant visa stated that the purpose of the trip was to attend a church seminar in New York and visit Korean churches in Los Angeles. Choe was granted a visa that allowed him to remain in the United States for three months. There were no limitations or travel restrictions on Choe's visit. Choe arrived in the United States in January 1982.

During his visit, a church in the Los Angeles area offered Choe a position as an assistant pastor. He accepted. The church filed a third preference immigrant visa petition on Choe's behalf.[1] At the same time, Choe filed an application to adjust his status. After an interview with the INS, Choe was granted

---

1. Third preference visas are generally allotted to individuals in professions that require a college education. A non-ordained minister would qualify for a third preference visa. Third preference visas were available for prospective immigrants from Korea at that time. *Interpreter Releases*, vol. 20, No. 20, Appendix IV, May 20, 1982.

lawful permanent resident status on September 17, 1982.[2] Choe never attended the church seminar in New York.

Choe then filed a second preference immigrant visa petition for his wife and child. The INS approved the petition in December 1982 and forwarded it to the United States Consul in Seoul. Mrs. Choe also applied for an immigrant visa for herself and her child at the United States Embassy in Seoul. A State Department official saw that a Reverend Bhang had signed some of the documents in Choe's file. Bhang was considered a questionable figure, one who signed documents manufactured solely for immigration purposes. In December 1983, the State Department suspended action on Choe's wife's visa application and sent a memorandum to the INS in Los Angeles requesting an investigation regarding Choe. In February 1984, an INS investigator interviewed Choe.

Time passed. The INS took no action against Choe, and his wife's visa application remained in abeyance. On December 30, 1987, Choe filed a mandamus action in U.S. District Court seeking action on the visa petitions for the Choe family.

In February 1988, the INS initiated deportation proceedings against Choe.

## B. *Procedural Background*

On February 4, 1988, the INS issued an Order to Show Cause alleging that Choe was deportable pursuant to 8 U.S.C. § 1251(a)(1) for having been excludable at time of entry under 8 U.S.C. § 1182(a)(19) [presently codified at 8 U.S.C. § 1182(a)(6)(C)(i) ].[3] Specifically, the INS charged that Choe obtained adjustment of status as a special immigrant minister through fraud. On April 26, 1988, the INS amended the Order to Show Cause to specify that Choe lacked two years ministerial experience required for special immigrant minister status and to add the allegation that Choe was deportable pursuant to 8 U.S.C. § 1251(a)(1) for having been excluda-

ble at time of entry under 8 U.S.C. § 1182(a)(20). Section 1182(a)(20) states that an alien is excludable at time of entry if the applicant is not in possession of a valid unexpired immigrant visa, except as otherwise provided by the Act.

A two day deportation hearing was held. On June 28, 1988, the Immigration Judge ("IJ") ordered the deportation proceeding terminated. The INS appealed. On June 27, 1991, the BIA reversed the decision of the IJ and ordered Choe deported from the United States. Choe petitions for review of that order.

## C. *Decision of the Immigration Judge*

The IJ issued an oral decision on June 16, 1988. On the issue of preconceived intent to remain, the charge under 8 U.S.C. § 1182(a)(20), the IJ found the testimony of the INS agent credible. However, the IJ further found that the INS had the opportunity to determine whether Choe had such a preconceived intent when he applied for adjustment of status. The IJ did "not feel a compelling need to look over the [INS] District Director's shoulder and second guess him at this date as the trail of evidence was much warmer in 1982 than it is today in 1988."

The IJ also found that the INS had not met its burden in establishing that Choe committed fraud at the time he applied for adjustment of status. 8 U.S.C. § 1182(a)(19). The IJ found the INS case "somewhat circumstantial." The case relied heavily on the findings of the American Consul concerning Rev. Bhang; the IJ found the opinion of the American Consul "not a substitute for actual evidence." In light of these findings, the IJ terminated the deportation proceedings against Choe.

## D. *BIA Decision*

The BIA made two principal determinations. First, it held that Choe could not be

---

**2.** Choe was not adjusted as a third preference immigrant, but rather as a special immigrant minister pursuant to 8 U.S.C. § 1101(a)(27)(C)(i).

**3.** The Immigration and Nationality Act of 1990 amended, reorganized, and redesignated signifi-

cant portions of the Immigration and Nationality Act of 1952. For consistency with the administrative record, citations are to the Act prior to the 1990 amendments.

charged with deportability as an alien excludable "at the time of entry" based on acts committed in conjunction with the application for adjustment of status. The BIA reasoned that Choe was not making an "entry" at the time he adjusted his status. The BIA therefore dismissed the INS appeal relating to deportability for fraud under 8 U.S.C. § 1182(a)(19).

Second, the BIA held that Choe was deportable under § 1182(a)(20) as an immigrant without a valid visa, based on Choe's preconceived intent to remain in the United States permanently at the time of his initial entry as a nonimmigrant. The BIA relied on evidence of Choe's preconceived intent as follows: (1) Choe adjusted his status within eight months of entry; (2) the "fraudulent" nature of his adjustment documents; (3) inconsistency of dates in the documents; and (4) Choe's decision not to travel to New York and his quick visa application for his family. Consequently, the BIA reversed the decision of the IJ and ordered Choe deported.

## II

The issue of whether an alien who entered the United States as a visitor and later adjusted his status to permanent resident is deportable on the basis that he entered with a preconceived intent to remain indefinitely is a question of law. Questions of law are reviewed *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### A. *Adjustment of Status*

For many years, the only avenue for gaining immigrant status required the issuance of an immigrant visa. Visas are not issued in the United States; they must be obtained from United States consular officers posted abroad. The INS found itself faced with aliens in this country in nonimmigrant status who could show they qualified for immigrant status and who wished to avoid a costly trip out of the country merely to obtain a visa.

▓ In the 1952 Immigration and Nationality Act ("INA"), Congress enacted § 245, 8 U.S.C. § 1255, which authorizes "adjustment of status" from nonimmigrant to immigrant for aliens who meet certain requirements. The whole process can be carried out by the INS, and the alien need not leave the United States. For the purposes of this process, the applicant for adjustment, although physically within the United States, is considered exactly as though he were at the border applying for initial entry. *Yui Sing Tse v. INS*, 596 F.2d 831, 834 (9th Cir.1979); *Hamid v. INS*, 538 F.2d 1389 (9th Cir.1976).

▓ There are three basic requirements for adjustment of status.

> The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a). Critics claim the availability of adjustment of status encourages fraud by nonimmigrant visa applicants. *See* Thomas Alexander Aleinikoff & David A. Martin, *Immigration: Process and Policy* 419 (Interim Second Edition 1991).[4]

---

4. Certain sections of the INA appear to prevent Choe's deportation. INA § 246(a), 8 U.S.C. § 1256(a), provides for rescission of adjustment of status acquired under § 245 if "it shall appear to the satisfaction of the Attorney General that the person was not in fact 'eligible for such adjustment of status." *See Kim v. Meese*, 810 F.2d 1494 (9th Cir.1987). However, there is a five-year statute of limitations on § 246 rescissions. The Justice Department has tried to explain away this provision, in an act nearly devoid of statutes of limitations, as "a historical anomaly or the result of an accident in the legislative process." *Oloteo v. INS*, 643 F.2d 679, 683 n. 8 (9th Cir. 1981). In two significant cases, the BIA read the section as providing immunity to removal for an adjusted alien after five years had passed. In both cases, the Attorney General reversed the BIA. *Matter of S.*, 9 I & N Dec. 548 (BIA 1961; AG 1962); *Matter of Belenzo*, 17 I & N Dec. 374 (BIA 1980; AG 1981). As a result, if the INS seeks to remove an adjusted alien within five years, it must commence rescission proceedings

■ The BIA relied on 8 U.S.C. § 1251 to order the deportation of Choe. In pertinent part, that provision provides:

Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry;

8 U.S.C. § 1251(a)(1). The grounds for exclusion are set forth at 8 U.S.C. § 1182. The BIA found Choe excludable under § 1182(a)(20), which provides that:

Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

(20) Except as otherwise specifically provided in this Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act....

The time of entry was January 1982; Choe applied for admission by arriving in the United States. He did not have a valid unexpired immigrant visa; he had a nonimmigrant visitor visa pursuant to 8 U.S.C. § 1101(a)(15)(B). This section allows the issuance of a nonimmigrant visa to "an alien ... having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure."

The INS claims that Choe intended to permanently immigrate to the United States—making his nonimmigrant visa invalid. Without a valid nonimmigrant visa, Choe was excludable, and is therefore deportable, under § 1182(a)(20). The INS insists that this entire proceeding, focused upon Choe's initial entry in January 1982, has nothing to do with adjustment of status. The BIA found Choe had a preconceived intent to remain—making him an immigrant without a valid immigrant visa. Or put another way, his preconceived intent made his nonimmigrant visa invalid.

Prior to 1960, entry into the United States with a preconceived intent to remain was a statutory bar to adjustment of status. Congress eliminated the bar with the Act of July 14, 1960, Pub.L. No. 86–648, 74 Stat. 505. *See Matter of Ibrahim*, 18 I & N Dec. 55, 57 (BIA 1981) ("Entry into the United States with a preconceived intention to remain was once a statutory bar to adjustment of status. Congress eliminated that bar in 1960.") A preconceived intent to remain is only one factor to be considered in exercising discretion on an adjustment application. *Matter of Battista*, 19 I & N Dec. 484, 486 (BIA 1987). Choe claims that the INS interpretation in effect reinstates preconceived intent as a bar to legal permanent residence status.

The INS argument, stated simply, is this: Although preconceived intent does not statutorily bar adjustment of status, after an alien's status has been adjusted to legal permanent resident, the alien can still be deported for entry with preconceived intent to remain. This statutory interpretation entirely negates the Congressional mandate that preconceived intent does not bar nonimmigrant aliens from becoming immigrant aliens.

The difficulty with the INS position becomes clearer in the context of a different scenario. If an alien, previously convicted of a drug offense, entered the United States and applied for adjustment of status, she would be excludable pursuant to 8 U.S.C. § 1251(a)(1). She would also be unable to receive an immigrant visa in her country of origin because of the drug offense. *See Monet v. INS*, 791 F.2d 752 (9th Cir.1986).

If Choe had been denied adjustment of status based on preconceived intent, he could have returned to Korea and applied for an immigrant visa and the denial of adjustment of status would not be considered at all. The alleged fact that he was excludable under § 1182(a)(20) when he entered in 1982 would not have prevented him from obtaining an

first, and then, if successful, start deportation proceedings. After five years, the INS may go directly to deportation proceedings. *See Matter*

*of Saunders*, 16 I & N Dec. 326 (BIA 1977). The bottom line is § 246 does not prevent the removal of adjusted aliens.

immigrant visa overseas if he was denied adjustment in the exercise of discretion.

Choe's position must be accepted to give any foundation to adjustment of status. The INS cites to *Oloteo v. INS*, 643 F.2d 679 (9th Cir.1981) and *Monet* for support of their contrary position. In *Oloteo*, the INS commenced deportation proceedings against adjusted aliens on the basis that their entry visas had been obtained by fraud under 8 U.S.C. § 1182(a)(19). In *Monet*, the INS commenced deportation proceedings under 8 U.S.C. § 1182(a)(11) against an adjusted alien because he had been convicted of possession of marijuana prior to his entry. Both of these "violations" are statutory bars to becoming a legal permanent resident. As previously discussed, preconceived intent is not a statutory bar to adjustment of status; it is a discretionary factor to be considered by the Attorney General. If the INS can now deport Choe based upon preconceived intent, the INS has reinstated the statutory bar removed by Congress.

Aliens who obtain adjusted status have a legitimate expectation that their immigration will be permanent. In *Fulgencio v. INS*, 573 F.2d 596, 598 (9th Cir.1978), we found unfair an order of adjustment that was granted on a conditional basis because it "undermine[d] the security which ought to attend permanent resident status." We have since held that the INS may deport adjusted aliens at any time because of violations that are statutory bars. Yet adjusted aliens are still entitled to some minimal sense of security in their permanent resident status. They should not remain constantly at risk for deportation because of preconceived intent, a discretionary factor considered during the adjustment proceeding itself.

This leads us to a *per se* rule. Aliens who have had their status adjusted under § 245 of the INA cannot later be deported for preconceived intent to remain in the United States at the time of initial entry. This does not mean that aliens who have been adjusted cannot be deported for other immigration violations—violations that are statutory bars to adjustment of status in the first place. The time for the INS to address preconceived intent is at the adjustment of status

stage. Fraud, if proved was inherent in the visa application; no fraud was inherent in the adjustment of status application. Taking every allegation against Choe as true, the INS cannot deport Choe on the basis of preconceived intent to remain in the United States after his adjustment of status.

### III

We **GRANT** the petition for review and **REMAND** to the Board of Immigration Appeals with instructions to terminate the deportation proceedings. Each party shall bear its costs of appeal.

ALARCON, Circuit Judge, specially concurring in part and dissenting in part.

In this matter, the Immigration and Naturalization Service (INS) issued an order to show cause against Reverend In Gun Choe charging that he was deportable on the basis that he was excludable at his time of entry into the United States because (1) he had obtained an adjustment of immigration status to permanent resident as a special immigrant minister by fraud or willful misrepresentation of a material fact; and (2) at the time of his entry into the United States as a visitor, he intended to remain permanently and to seek employment. The Immigration Judge ("IJ"), after weighing the evidence and evaluating the credibility of the witnesses, terminated the deportation proceedings against Reverend Choe because the INS had "not met its burden of deportability by evidence which is clear, convincing and unequivocal[.]" The INS appealed to the Board of Immigration Appeals ("BIA"). The BIA reversed the IJ's decision. The BIA ordered the deportation of Reverend Choe.

The BIA found that Reverend Choe's preconceived intent at the time of entry to remain indefinitely had been proven by clear, convincing and unequivocal evidence. The BIA dismissed the INS' allegation that Reverend Choe was excludable because he had obtained his adjustment of status by fraud or willful misrepresentation. The INS did not appeal from this ruling.

The Majority decision reverses the BIA's holding that the evidence of preconceived

intent was sufficient to support an order of deportation, but not because it agreed with the IJ's contrary determination. Instead, the Majority assumes, without discussion, that the evidence is sufficient to support deportation based on preconceived intent. The Majority's decision reverses the BIA's order by creating a "per se" rule that abolishes the Attorney General's authority to deport an alien who misrepresents his intention on a visa application at the time of entry into the United States in violation of section 241(a)(1), 8 U.S.C. § 1251(a)(1) (1988),[1] and section 212(a)(20), 8 U.S.C. § 1182(a)(20) (1988).[2]

I concur in the judgment insofar as it reverses the BIA's decision to order deportation. The IJ correctly concluded that the INS did not sustain its burden of proving by clear, convincing and unequivocal evidence that Reverend Choe misrepresented his intention at the time he applied for a visitor visa. I dissent from the Majority's attempt to deprive the Attorney General of her discretionary authority under section 241(a)(1), 8 U.S.C. § 1251(a)(1) and section 212(a)(20), 8 U.S.C. § 1182(a)(20), to deport aliens who misrepresent their intention of remaining permanently in this country at the time of entry.

The Majority holds that aliens who illegally enter the United States as tourists by misrepresenting their true intent to remain permanently will be shielded from the consequences of their deceit so long as they successfully continue to conceal their true intent until after their immigration status is adjusted to permanent lawful resident. Under the Majority's revision of sections 241(a)(1) and 212(a)(20), if the deception is not discovered until after the adjustment of status, the Attorney General is now powerless to deport an alien for his or her violation of the immigra-

tion laws, notwithstanding the unequivocal power to do so conferred by Congress in sections 241(a)(1) and 212(a)(20). This holding rewards the successful cheat while penalizing the clumsy one; it encourages the use of fraud to evade the immigration laws. Congress clearly could not have anticipated that its plain language would be construed to reach such an unfair and absurd result.

This court lacks the power to amend a statute based on its own notion of what the law ought to be. We need not violate the doctrine of the separation of powers by making new law that is contrary to the intent of Congress to conclude in this case that the BIA erred in determining that Reverend Choe was an alien excludable at his initial entry because he lacked a valid immigrant visa. The narrow legal question presented to us by the BIA's order of deportation is simply whether each material fact considered by the BIA was proved clearly, convincingly and unequivocally by substantial, reasonable and probative evidence in the record. The evidence relied upon by the BIA does not meet this standard. I would reverse the BIA's decision solely on the ground that the evidence is insufficient to show that Reverend Choe had a preconceived intent to remain permanently in the United States at the time of entry.

## I.

### FACTUAL BACKGROUND

On December 23, 1981, the Consular Section of the American Embassy in Seoul, Korea issued a B–2 visitor's visa to Reverend Choe. Reverend Choe's visa application stated that the purpose of the trip was "[t]o attend & church seminar" and that he planned to stay in the United States two weeks. Reverend Choe later testified at his

---

1. In 1988, the year deportation charges were brought against Reverend Choe, section 241(a)(1) provided that "[a]ny alien in the United States ... shall, upon order of the Attorney General, be deported who—(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry[.]" 8 U.S.C. § 1251(a)(1) (1988). Currently, the section provides that any alien within the United States shall be deported upon order of the Attorney General if the alien "at the time of entry or adjustment of status was within one or more of the classes of aliens excludable by the law exist-

ing at such time...." 8 U.S.C. § 1251(a)(1)(A) (Supp. IV 1992). Like the Majority, I have used the pre–1990 codification of the Act in the citations to this opinion. Where appropriate, I have also provided the current code cites.

2. Under section 212(a)(20) "any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa ..." is excludable and ineligible to receive a visa. 8 U.S.C. § 1182(a)(20) (1988) (current version at 8 U.S.C. § 1182(a)(7)(A)(i)(I) (Supp. IV 1992)).

deportation hearing that he planned to go to a religious seminar in New York City and to visit Korean–American churches in Los Angeles, California.

Reverend Choe's visitor visa allowed him to remain in the United States for three months. He arrived in Los Angeles in January of 1982. He did not attend the religious seminar in New York.

The Bellflower United Church offered Reverend Choe a permanent job as an assistant pastor, approximately one month after Reverend Choe's entry into the United States. On April 20, 1982, Bellflower United Church filed a third preference immigrant visa petition on Reverend Choe's behalf.[3] On April 22, 1982, Reverend Choe applied to the INS for authorization to work. His request was granted on May 6, 1982.

On April 28, 1982, Reverend Choe filed an application with the INS to adjust his status to permanent resident as a special immigrant minister. 8 U.S.C. § 1101(a)(27)(C)(i).[4] Following an interview conducted in Los Angeles, California on August 5, 1982, the INS approved Reverend Choe's adjustment of status application on September 17, 1982. Prior to the grant of adjustment of status, the INS was unaware of any facts that demonstrated that Reverend Choe had made any false statements concerning his intent when he applied for a visitor's visa in December of 1981. The INS first became aware that Reverend Choe may have misrepresented his true intent in his visitor's visa application when the Embassy's Consular Investigation Unit in Seoul, Korea sent a memorandum in December of 1983 to the Los Angeles INS office requesting that an investigation be conducted concerning the alleged falsity of statements in Reverend Choe's application for adjustment of status.

Deportation proceedings were initiated against Reverend Choe on February 4, 1988, based on the theory that he was excludable at his time of entry into the United States pursuant to section 241(a)(1) of the Immigration and Nationality Act ("Act"). 8 U.S.C. § 1251(a)(1) (1988). The INS alleged two distinct statutory grounds of exclusion. First, Reverend Choe was excludable pursuant to section 212(a)(19), 8 U.S.C. § 1182(a)(19) (1988),[5] because (1) he had submitted fraudulent documentation to establish his qualifications as a minister; and (2) he did not have the requisite two years continuous experience as a minister when he applied for adjustment of status to permanent resident as a special immigrant minister. Second, Reverend Choe was excludable because he intended to remain indefinitely when he entered the United States in January of 1982 without an immigrant visa as required by section 212(a)(20), 8 U.S.C. § 1182(a)(20) (1988).[6] The BIA upheld the deportation order on this ground and dismissed the INS' appeal of the dismissal of the fraud allegation.

## II.

### EVIDENTIARY BASIS OF THE BIA'S FINDING OF PRECONCEIVED INTENT

#### A. The INS Had the Burden of Proving Preconceived Intent.

In deportation cases, the INS has the burden of proving that the facts alleged as

---

3. A limited number of visas are available to "qualified immigrants who are members of the professions, ... and whose services in the professions, ... are sought by an employer in the United States." 8 U.S.C. § 1153(a)(3) (1988) (current version at 8 U.S.C. § 1153(b)(1) (Supp. IV 1990)).

4. To be eligible as a special immigrant minister pursuant to 8 U.S.C. § 1101(a)(27)(C)(i), the alien must establish that "he is an immigrant who continuously for at least two years immediately preceding the time of his application or admission to the United States has been, and who seeks to enter the United States solely for the purpose of carrying on the vocation of minister of a religious denomination, and whose ser-

vices are needed by such religious denomination having a bona fide organization in the United States." *Matter of Lasike*, 17 I & N Dec. 445, 446 (1980).

5. Section 212(a)(19) provides that "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure, or has sought to procure, or has procured, a visa, or other documentation, or entry into the United States or other benefit" is excludable. 8 U.S.C. § 1182(a)(19) (1988) (current version at 8 U.S.C. § 1182(a)(6)(C)(i) (Supp. IV 1992)).

6. The text of section 212(a)(20) is set forth, *supra* n. 2.

grounds for the deportation order are true "by clear, convincing and unequivocal evidence which does not leave the issue in doubt." *Laipenieks v. INS*, 750 F.2d 1427, 1429 (9th Cir.1985) (citations omitted). On an appeal from a deportation order to this court, we must consider whether there is reasonable, substantial and probative evidence in the record, when considered as a whole, to support a finding that each material fact has been established by clear, convincing and unequivocal evidence. *Id.*

A finding of preconceived intent is not supported by proof that, upon entry, an alien may have wanted to remain in the United States permanently if he was able to do so legally. *See Lauvik v. INS*, 910 F.2d 658, 661 (9th Cir.1990) ("[A]n alien's desire to remain in the United States does not negate his intent to depart upon termination of his temporary status.") (citing a long line of precedent); *Bong Youn Choy v. Barber*, 279 F.2d 642, 645–46 (9th Cir.1960) (no preconceived intent to remain where alien only intended to remain temporarily unless he could arrange legally for permanent status). *Matter of Chartier*, 16 I & N Dec. 284, 288 n. 5 (1977) (INS must prove more than that alien hoped from beginning to be able to adjust his status to that of a lawful permanent resident). The INS must prove that Reverend Choe entered the United States " 'on a temporary permission but with· a determination to stay here if possible—meaning by any means possible,—so that his representations to the authorities are false, or fraudulent or misrepresentative.' " *Bong Youn Choy*, 279 F.2d at 645 (quoting *Brownell v. Carija*, 254 F.2d 78, 80 (D.C.Cir.1957)).

The BIA's finding that the INS carried its burden of proving preconceived intent contradicts that of the IJ. Under such circumstances, a reviewing court must scrutinize more closely the decision of the BIA. *Laipenieks v. INS*, 750 F.2d at 1429–30. The Majority has failed to do so. Accordingly, I must now do so.

B.  *Evidence Offered by INS To Prove Preconceived Intent.*

To prove preconceived intent at the deportation hearing, the INS offered the following documentary evidence: Exhibit 10, a certified copy of Reverend Choe's December 1981 tourist visa application; Exhibit 11, a certified transcription of an interview of Reverend Choe conducted by the INS on April 4, 1984; Exhibit 12, a certified copy of Form 1–181, the agency record of the September 17, 1982, order adjusting Reverend Choe's status to that of a special immigrant minister; and Exhibit 13, a certified copy of a memorandum dated December 19, 1983, from the American Consul in Seoul, Korea, to the INS in Los Angeles requesting an investigation into Reverend Choe's ministerial qualifications. In addition, the INS offered the testimony of INS Investigator Gary Olson regarding Reverend Choe's statements during an interview conducted on April 4, 1984.

1.  *Evidence of the Rapid Sequence of Events.*

The BIA determined that the "rapid sequence of events[,]" beginning with Reverend Choe's immediate arrival in California rather than New York and "concluding with his adjustment of status only eight months thereafter," indicated that at the time Reverend Choe entered as a tourist, he intended to remain permanently in the United States. BIA at 9–10. The "rapid sequence of events" test, however, is generally applied to exclusion or adjustment of status proceedings wherein *the alien* bears the burden of showing a lack of preconceived intent to remain permanently in the United States at the time of entry and the evidence shows "hasty action" by the alien in applying for adjustment of status from that of a nonimmigrant. *See, e.g., Matter of Patel*, 19 I & N Dec. 774, 786 (1988) (discussing validity of "rapid sequence of events test" to cases where "hasty action" by the alien renders the inference of lack of bona fide intent virtually inescapable; examples of hasty action include alien's adjustment application filed within nine days of entry as nonimmigrant visitor and alien's petition for treaty investor status where business deal consummated 15 days after entry as nonimmigrant visitor) (citations omitted).[7]

---

7.  In a petition for review of an adjustment of

status case, or an exclusion case, the alien bears

The cases relied on by the BIA to support a finding of preconceived intent based on circumstantial factors are inapposite.[8] There is no evidence that Reverend Choe violated the immigration laws upon entry into this country by establishing residency and immediately commencing to work.[9] Reverend Choe did not apply for adjustment of status within sixteen days [10] of his entry; he did not allow his tourist visa to expire before seeking an adjustment of status.[11] Reverend Choe never admitted, in a sworn statement, that he had lied when he applied for a tourist visa and represented under oath that he only intended to visit the United States.[12] He did not misrepresent his citizenship to gain entry.[13]

the burden of proof and of persuasion to show that the discretionary award of the privilege is warranted or that the exclusion is not warranted. *Matter of Phillis*, 15 I & N Dec. 385, 386 (1975); *Matter of Kane*, 15 I & N Dec. 258, 264 (1975). Appellate review is for abuse of discretion; a finding cannot be disturbed unless the hearing officer acted arbitrarily, capriciously or abusively in the exercise of his discretion. *Cubillos–Gonzalez v. INS*, 352 F.2d 782, 783 (9th Cir.1965); *Bark v. INS*, 511 F.2d 1200, 1203 (9th Cir.1975).

8. In its decision, the BIA noted that a determination of intent necessarily entails a review of circumstantial factors, even assuming direct evidence of a statement of alleged intent. BIA at 9. The cases cited by the BIA, however, are not deportation cases in which the INS has the burden of proof. Furthermore, each is clearly distinguishable. *E.g., Bark v. INS*, 511 F.2d 1200 (9th Cir.1975) (appeal from denial of adjustment of status based on sham marriage remanded to allow INS to develop evidence of intent at marriage instead of improperly relying solely on fact of separation; parties testified they intended to marry for love but later separated); *Matter of Phillis*, 15 I & N Dec. 385 (1975) (denial of application for immediate relative status without prejudice to submission of new visa petition; *petitioner did not meet burden* because: petitioner gave inconsistent statements to the INS, first claiming he had lived with wife since marriage, then four months later, admitting he had never lived with his wife; he admitted that he had never listed the beneficiary as his wife on any document; and beneficiary's statements conflicted with those of Petitioner); *Matter of Kane*, 15 I & N Dec. 258 (1975) (exclusion of a resident alien from re-entry because her testimony established that she resided and worked in another country and only visited United States one month out of the year to preserve her immigration status, and now offered to stay permanently if that was required; BIA determined her status had changed since her absences were not temporary in nature and annual returns to this country were solely to retain her status).

9. *Compare* the instant case *with Matter of Garcia–Castillo*, 10 I & N Dec. 516 (1964) (deportation upheld where alien, who remained in country after denial of application for lawful resident, admitted he had obtained employment one week after entry even though he knew it was illegal, that he had deceived the Consul when he applied for tourist visa, and he had intended to gain permanent residence when he arrived) *and Matter of Lasike*, 17 I & N Dec. 445, 446–48 (1980) (deportation upheld where alien refused to depart after denial of adjustment of status to special immigrant minister because none of his documentary evidence established that he had been carrying on vocation of minister of a religious denomination for two years prior to denial of application; discretionary denial of adjustment based on preconceived intent upheld where alien applied for "ministerial recognition" only eleven days after entry with tourist visa and five months later obtained "Christian Worker's Certificate" entitling him to conduct religious services, letter of recommendation for ministry overseas predated his entry, and he started employment immediately upon entry but falsely stated in his request for extension of tourist visa that his intent was only to continue in his visitor status).

10. *Compare* the instant case *with Matter of Ro*, 16 I & N Dec. 93 (1977) (denial of application for adjustment on preconceived intent where petitioner applied for adjustment of status within sixteen days of his entry into the United States).

11. *Compare* the instant case *with Castillo v. INS*, 350 F.2d 1 (9th Cir.1965) (deportation upheld where alien remained in the country after denial of adjustment of status based on flagrant disregard of lawful visa procedures; alien had obtained work shortly after entry with a tourist visa, even though he knew it was illegal, he admitted he had lied about working when he was interviewed by the INS, and he filed his application for adjustment of status *after* his tourist visa had expired).

12. *Compare* the instant case *with Cubillos–Gonzalez*, 352 F.2d 782 (9th Cir.1965) (deportation order upheld where alien, whose adjustment of status application had been denied, refused to leave the country; no abuse of discretion in denying an adjustment application based on preconceived intent because the alien admitted, under oath, he had actually intended to reside permanently in the United States when he secured his tourist visa and stated under oath he intended only a thirty-day visit).

13. *Compare* the instant case with *Soo Yuen v. INS*, 456 F.2d 1107 (9th Cir.1972) (alien jumped ship in Canada and gained entry as a passenger at Detroit, Michigan, using Canadian citizen's

The uncontradicted evidence shows that Reverend Choe's applications for authorization to work and for adjustment of status followed an offer of employment one month after his arrival on January 12, 1982, from one of the churches he visited after arriving in Southern California. His tourist visa still was valid when applied for a work permit and adjustment of status. The fact that he filed these applications does not support an inference that Reverend Choe entered the United States with the intent to remain permanently.

2. *Evidence That Choe Failed to Travel to New York City.*

In its opinion reversing the IJ, the BIA placed special emphasis on Reverend Choe's "admission" that he had told the American Consul in Seoul that he was coming to this country for a two-week visit to attend a seminar in New York City, but did not do so. BIA at 10. The BIA noted that Reverend Choe never explained his change of travel plans "at any point in these proceedings." *Id.* The record does not support the BIA's finding that Reverend Choe admitted he told the American Consulate he was coming to America for the sole purpose of attending a church seminar.

Reverend Choe testified at the deportation hearing that his purpose in coming to America was to visit Korean–American churches and to attend a seminar in New York City. On cross-examination, Reverend Choe was asked, "[a]nd did you tell the American Consulate that you were coming for a two-week visit to attend a church seminar in New York?," Reverend Choe answered "Yes." This answer does not support an inference that Reverend Choe failed to tell the American Consul of his plan to visit Korean–American churches. Reverend Choe was not asked on cross-examination if he told the American Consul that he planned to visit Korean–American Churches. Reverend Choe's testimony simply does not support a finding that he employed subterfuge to gain a nonimmigrant visa. The BIA's reliance on *Cubillos–Gonzalez v. INS,* 352 F.2d 782 (9th Cir.1965) and *Castillo v. INS,* 350 F.2d 1 (9th Cir.1965)

identification and masquerading as a Japanese of

is misplaced. In these cases, the aliens admitted they had lied about their preconceived intent to obtain visitor's visas. *Cubillos–Gonzalez,* 352 F.2d at 783; *Castillo,* 350 F.2d at 2.

In his nonimmigrant visa application, Reverend Choe stated that the purpose of his trip was "[t]o attend & church seminar." The transcript of the deportation hearing demonstrates that Reverend Choe speaks English with some difficulty. Although the meaning of Reverend Choe's typewritten response is not clear, it is not inconsistent with the statements he made to INS Investigator Gary Olson on April 4, 1984. Reverend Choe told INS Investigator Olson that he came to America for two reasons: (1) he wanted to visit and learn about Korean–American churches; and (2) he wanted to go to a revival meeting.

The BIA ignored Olson's testimony before the IJ concerning Reverend Choe's change in travel plans. When the IJ asked Olson whether his 1984 interview with Reverend Choe had disclosed facts from which it could be inferred that Reverend Choe had defrauded the United States or that he had merely changed his mind about his trip, Olson testified that it was "a matter for debate." The IJ found that Olson's testimony was credible; the BIA relied on that finding of credibility. Olson's opinion concerning Reverend Choe's travel plans demonstrates that the fact that he did not travel to New York does not constitute clear, convincing, and unequivocal evidence of preconceived intent.

The record supports the BIA's finding that Reverend Choe has never given any explanation for his failure to go to New York. There is no evidence, however, that Reverend Choe has ever been asked for an explanation. In any event, I cannot attach significant probative force to a change in Reverend Choe's itinerary. The uncontradicted evidence shows that Reverend Choe stayed in Los Angeles and visited churches and did not attend the seminar in New York City. The inference drawn by the BIA that Reverend Choe harbored a preconceived intent based on the fact that he did not travel to New

Canadian nationality).

York is unreasonable "unless we are reasonably assured that is more probable than not" that people with tourist visas who change their travel plans either before or after entry into the United States intended to remain permanently at entry. *Bark v. INS,* 511 F.2d 1200, 1202 (9th Cir.1975). "Common experience is directly to the contrary." *Id.* Tourists routinely change plans for all kinds of reasons that have nothing to do with preconceived intent to remain permanently in the United States.

### 3. The American Consul's Request for an Investigation.

The BIA found that Reverend Choe was one of ten individuals who entered the United States together and never left. This finding is not supported by the record. Exhibit 13, a report from the American Embassy in Seoul, Korea dated December 19, 1983, states only that Reverend Choe "was one of a group of ten individuals issued visas on 12/23/81 to attend this alleged religious seminar in New York. It is assumed that most, if not all, of these ten individuals have remained in the U.S." The report does not set forth facts to support this assumption.[14]

"Uncontradicted hearsay is admissible in deportation proceedings if it is probative and its use is not 'fundamentally unfair so as to deprive [the alien] of due process.'" *Tashnizi v. INS,* 585 F.2d 781, 782–83 (5th Cir.1978) (quoting *Marlowe v. INS,* 457 F.2d 1314 (9th Cir.1972)); *see also Cunanan v. INS,* 856 F.2d 1373, 1374 (9th Cir.1988) ("test for admissibility is whether the hearsay statement is 'probative' and whether its admission is 'fundamentally fair'"). Without factual support, an assumption by an out of court declarant that nine other visiting Korean aliens did not leave the United States has no probative value.

The BIA also relied on the unsupported assertion in Exhibit 13 [15] that "while [Choe] was applying for adjustment, his wife was

applying for a nonimmigrant student visa." BIA at 19. The Embassy report quotes Reverend Choe's wife as stating that he was employed as a minister in Korea and was not interested in going to the United States. The hearsay statements in the Embassy report do not support an inference that Reverend Choe had a preconceived intent to remain permanently in the United States. If they have any evidentiary value, it would be to demonstrate that he had no intention of remaining in the United States at the time of his entry as a visitor.

The BIA also noted that one month after Reverend Choe's adjustment of status, he filed second preference visa petitions on behalf of his child and wife. The BIA found that the filing of these petitions "combined with his wife's earlier attempts to enter clearly reflect a predesigned intention to immigrate to the United States." BIA at 20. Reverend Choe's status was adjusted in September of 1982; he entered in January of 1982. That Reverend Choe would seek to be reunited with his family one month after obtaining permanent resident status in this country would logically support an inference that Reverend Choe wanted his family to be with him in the country where he was a permanent resident; it does not tend to demonstrate that Reverend Choe had an intent to remain permanently in the United States at the time of entry.

### C. Evidence Offered to Prove Fraud in the Application for Adjustment of Status.

In determining that the INS had demonstrated preconceived intent "beyond a doubt," the BIA relied on evidence offered by the INS to prove that Reverend Choe was deportable pursuant to section 212(a)(19), 18 U.S.C. § 1182(a)(19) (1988), because he had submitted fraudulent documentation to support his adjustment of status application.

---

**14.** Reverend Choe objected to the admission of this document without articulating the basis at that time. Nevertheless throughout the proceeding, Reverend Choe's attorney objected that the Government's evidence was "hearsay on hearsay," and an unsupported conclusion, a characterization the Immigration Judge adopted.

**15.** Although Exhibit 13 states that a copy of the petition Choe's wife submitted for immigrant status is attached, the petition was not included as part of Exhibit 13.

BIA at 10. To qualify for an adjustment to special immigrant minister status, Reverend Choe had to meet the following prerequisites: (1) two years of continuous ministerial experience immediately preceding the time of application for admission into the United States; (2) entry into the United States solely for the purpose of carrying on the vocation of minister of a religious denomination; and (3) establishment of need for the alien's services by a religious denomination having a bona fide organization in the United States. 8 U.S.C. § 1101(a)(27)(C)(i) (1988).[16]

Reverend Choe demonstrated his prior ministerial experience by submitting five documents in his adjustment of status application: a certificate of employment; a certificate of ordained minister; a recommendation; a certification of the seal of the General Assembly of the Korean Presbyterian Church; and a verification of employment. All of these documents were signed by the Reverend Boo Shim Bhang and were dated February 15, 1982.

To prove, at the deportation hearing, that Reverend Choe obtained his adjustment of status by fraud or misrepresentation of a material fact, the INS introduced evidence that he submitted fraudulent documents regarding his qualifications as a minister. The BIA affirmed the IJ's termination of deportation proceedings based on the fraud charge— not for insufficiency of the evidence, but because Reverend Choe had not made an "entry" into this country when he applied for adjustment of status. Since Reverend Choe had not made an entry, his conduct could not violate section 212(a)(19).[17] The BIA nevertheless supported its finding of preconceived intent with the evidence offered by the INS to prove the fraud charge. The argument that these allegedly fraudulent documents

also proved Reverend Choe's preconceived intent when he entered the United States as a tourist first surfaced during the INS' appeal to the BIA.[18]

The BIA's reliance on the allegedly fraudulent nature of the adjustment of status documents to prove preconceived intent at the time of entry was fundamentally unfair to Reverend Choe. During the deportation hearing, the INS offered this evidence solely to prove that Reverend Choe obtained adjustment of status by fraud or willful misrepresentation—specifically that, at the time of Reverend Choe's application for *adjustment,* he lacked the requisite two years continuous ministerial experience to qualify as a special immigrant minister. To prove section 212(a)(19) fraud, the INS must establish that the alien sought to procure "a visa or other documentation or seeks to enter the United States, by fraud, or by willfully misrepresenting a *material fact....*" 8 U.S.C. § 1182(a)(19) (1988) (emphasis added). Reverend Choe's defense strategy was to show that any alleged errors in the documents were not material to his qualifications as a special minister.

The lack of notice that evidence of the allegedly fraudulent nature of the adjustment documentation would be used by the BIA to support its finding of preconceived intent denied Reverend Choe the opportunity to present evidence to rebut this new theory. *See Woodby v. INS,* 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966) (no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence "that the facts alleged as grounds for deportation are true") (footnote omitted). Reverend Choe was denied a meaningful opportunity to litigate the issues presented on appeal. *Nicholas v. INS,* 590 F.2d 802, 809

---

16. The statute provides a special immigrant includes "an immigrant who continuously for at least two years immediately preceding the time of his application for admission to the United States has been, and who seeks to enter the United States solely for the purpose of carrying on the vocation of minister of a religious denomination, and whose services are needed by such religious denomination having a bona fide organization in the United States." 8 U.S.C. § 1101(a)(27)(C)(i) (1988) (current version at 8 U.S.C. § 1101(a)(27)(C)(i)–(iii) (Supp. IV 1992)).

17. The text of section 212(a)(19), 8 U.S.C. § 1182(a)(19) (1988), is set forth, *supra* n. 5.

18. On appeal to the BIA, the INS argued that the rapid sequence of events, the use of fraud, and Reverend Choe's failure to attend the seminar in New York City "showed [him] to be an intending immigrant."

**938**

(9th Cir.1979) (alien is denied a full and fair deportation hearing which due process guarantees "only if the thing complained of causes the alien to suffer some prejudice.").

More important, the BIA's reliance on the allegedly fraudulent nature of the documentation submitted by Reverend Choe when he applied for an adjustment of status—almost five months after he had applied for a tourist visa—seems to be a wholesale adoption of the familiar logical fallacy, *post hoc ergo procter hoc* (literally, "after this, therefore because of this"). *See, e.g., Dreijer v. Girod Motor Co.,* 294 F.2d 549, 555 (5th Cir.1961) ("[w]hen the facts are . . . so meager as they are here and an effect may follow from one of several causes it is a false generalization to suppose that because a sinking follows a collision thirty-nine days later, the sinking necessarily was an effect of the collision."). That the documents submitted to obtain an adjustment of status may have contained false statements proves only that Reverend Choe may have defrauded the INS when he won his adjustment of immigration status to permanent resident alien; it does not support a reasonable inference that the original entry several months earlier was part of a preconceived scheme to remain in the United States through illegal means. *Cf. Bark v. INS,* 511 F.2d 1200 (9th Cir.1975) (fact that husband and wife later separated does not prove their marriage was a sham at its inception; focus should be the parties' intent at the time of marriage).

In concluding that Reverend Choe's adjustment documents were fraudulent on their face, the BIA relied principally on Exhibit 16, the May 6, 1988, Embassy investigative report and supporting affidavits. The BIA also noted that Exhibit 13 set forth the American Consul's opinion that Reverend Bhang, whose signature appeared on Reverend Choe's supporting documentation, had "prominently figured in a prior immigration scam." [19] BIA at 13. The BIA drew upon the opinions of the Embassy Report and the attached translations of affidavits to determine that (1) certain inconsistencies in Reverend Choe's certificate of ordination and employment certification were material and therefore rendered the adjustment documents fraudulent on their face, regardless of whether Reverend Bhang signed them; and (2) that the timing of Reverend Choe's request for the adjustment documentation and a letter of recommendation demonstrated Reverend Choe's deception. These findings are not supported by substantial evidence.

### 1. *Choe's Ordination Certificate.*

The BIA found that Reverend Choe's ordination certificate "falsely represents that [Reverend Choe] was ordained under the Tong Hap Presbyterian denomination when, by his own testimony . . . [this] is clearly false." BIA at 18. The translation of the certificate of ordination, however, does not contain a representation that Reverend Choe was ordained under the Tong Hap Presbyterian denomination. Further, Reverend Choe testified that he was ordained into the Gaehyok Jungtong denomination, not the Tong Hap denomination. Following his ordination, Reverend Choe began employment as an associate minister at the Selin Church, which was a Tong Hap denomination church. He continued this employment until he left for the United States.

Dr. Hae Soung Kim, Moderator of the Hap Dong denomination of the Korean Presbyterian Church testified that it was possible for a minister ordained in one denomination to work as a minister at a different denomination's church. Dr. Kim also asserted that Reverend Choe was ordained in Korea. The IJ found him credible; the BIA's review of the evidence did not recite or refer to Dr. Kim's testimony. Under these circumstances, we presume that the witness' testimony is credible. *See Canjura–Flores v. INS,* 784 F.2d 885, 889 (9th Cir.1985)

---

19. The hearsay opinion about Reverend Bhang contained in Exhibit 13 is not probative of Reverend Choe's preconceived intent. That Reverend Bhang may be involved in immigration fraud does not constitute evidence that Reverend Choe had a preconceived intent to remain in the United States when he entered with a nonimmigrant visa. As the Immigration Judge aptly noted, "[a]ssuming arguendo that the person who ordained respondent had engaged in fraudulent ordinations to help out Korean ministers coming to the United States, that in itself will not substitute for proof that the credentials in respondent's case were fraudulent."

("[w]hen the decisions of the Immigration Judge and the Board are silent on the question of credibility ... we will presume that they found the [witness] credible.").[20]

The other alleged misrepresentations contained in the ordination certificate are equally insubstantial and irrelevant to the question whether Reverend Choe met the ministerial qualifications for special immigrant minister status. The BIA inferred that the ordination certificate falsely associated Reverend Boo Shim Bhang with the Selin Church since it was issued under Reverend Bhang's seal as Chairman, General Assembly of the Presbyterian Church in Korea. The BIA relied on Reverend Bhang's admission in his 1988 affidavit, Exhibit 16, that he was not an ordained Tong Hap minister.[21] Assuming this is true, it is not material in proving whether Reverend Choe was ordained in another denomination of the Korean Presbyterian Church.

The BIA also concluded that the ordination certificate misrepresented Reverend Joo as chairman of the South Seoul Presbytery. According to the BIA, the ordination certificate also incorrectly stated that Reverend Joo was a member of the ordination committee. The certificate of ordination contained in the administrative record, however, does not appear to contain these claimed misrepresentations. Moreover, these discrepancies, even if they existed, are insubstantial and irrelevant to an assessment of Reverend Choe's ministerial qualifications. Reverend Joo's May 19, 1988, affidavit, which the BIA specifically found credible, states that Reverend Joo was present at Reverend Choe's ordination into the Gaeyok Jungtong denomination of the General Assembly of the Korean Presbyterian Church in 1978.[22]

The INS does not claim that the Gaeyok Jungtong denomination into which Reverend Choe was ordained was not a recognized religious denomination for purposes of the special immigrant minister status. There is no evidence in the record that supports an inference that Reverend Choe was not ordained in 1978. The claimed inconsistencies in the ordination certificate do not support an inference of intentional deception. During the deportation proceedings, the INS conceded that whether or not Reverend Choe was ordained was not material to the fraud allegation. Rather, the issue was "what duties" Reverend Choe was performing two years prior to his application for adjustment of status.

### 2. Certificate of Employment.

The certificate of employment listed Reverend Choe's employment with the "Serin" Church as an associate minister from September 10, 1978 until February 10, 1982. The BIA concluded that the February 10, 1982, termination date on the employment certificate was fraudulent because Reverend Choe was already present in the United States at this time. An inference of fraud cannot reasonably be drawn from the mere fact that Reverend Choe terminated his employment with the Selin Church once he accepted the employment offer at the Bellflower United Church in February of 1982.

There is no dispute in the record that Reverend Choe was employed in a ministerial capacity by the Selin Church; Reverend Choe's application for alien employment certification, Exhibit 18, indicated that he assisted the pastor in "conducting and performing

20. The BIA relied on the translated affidavits of Tong Hap denomination officials John V. Moore and Nak Un Kim, included in Exhibit 16. The translated affidavit of Nak Un Kim is not part of the administrative record certified to this court. Moore's affidavit merely corroborates Reverend Choe's testimony: he was not ordained into the Tong Hap denomination.

21. As the Immigration Judge noted, the INS' use of Reverend Bhang's affidavit seemed "incredible" because in the earlier part of the case "the [INS] relied [on the Consul's opinion to establish] ... Reverend Bhang as being a fraudulent diploma mill supplier for Korean ministers in-

tending to go to the United States," yet to prove the fraud charge, the INS proffered his sworn statements as competent evidence. The BIA's reliance on the 1988 affidavit of Reverend Bhang is equally incredible, since the BIA found the affidavit was unreliable.

22. In his May 9, 1988, affidavit, Reverend Joo stated, "I attended the ordination ceremony in 1978 when Rev. REVEREND CHOE, In Gun was ordained by the General Assembly of Presbyterian Church in Korea (Gaehyok Jungtong) in order to congratulate him. I imposed hands on REVEREND CHOE, In Gun's head when he was ordained."

religious worship and spiritual functions[;] serve as Evangelist and Missionary for church." These representations are consistent with Reverend Choe's December 22, 1981 assertion in his tourist visa application that his profession was "Mission worker, Evangelist."

The BIA, however, drew an inference that Reverend Choe's employment certificate was fraudulent based on facts set forth in the April 18, 1988, affidavit of Reverend Joo. Reverend Joo described Reverend Choe as having worked as a cooperative minister at the Selin church. The BIA also noted that Reverend Joo's affidavit established that Reverend Choe could not have been invited to the Selin church as a regular minister because he was not a graduate of a Tong Hap denomination seminary. This latter statement is not part of the administrative record certified to this court because the second page of Joo's April 18, 1988, affidavit is missing. Our review is limited to the certified administrative record. 8 U.S.C. § 1105a(a)(4) (1988). Even assuming the allegation is true, however, an inference of fraud by Reverend Choe could not be drawn logically from this evidence. Reverend Choe never claimed that he was a "regular" minister at the Selin church. Further, there was no evidence that the duties performed by Reverend Choe for the Selin Church were not ministerial in nature for purposes of the special immigrant minister status.

### 3. *Request for Documents.*

The BIA found that Reverend Choe executed a "well-orchestrated scheme" and "course of deception" because Reverend Choe had made "requests for recommendations as early as one year prior to his departure from Korea." BIA at 10. The record does not support the BIA's finding that Reverend Choe requested recommendations as early as one year prior to his departure. The first page of the translation of Reverend Joo's April 18, 1988, affidavit related that Reverend Choe worked as a cooperative minister from 1978 to 1980 at the Selin Church in Korea and that, "[t]o my knowledge, it was one year after his resignation, Rev. CHOE asked to me give him a letter of experience,

stating that he had plan [sic] to go to the United States, so I gave" The translation ends with an uncompleted sentence because the remainder of the affidavit was not included in the administrative record certified to this court. Nevertheless, evidence that Reverend Choe obtained a letter of experience does not support a conclusion that he was prepared to enter, or remain in, the United States under false pretenses. At best, it indicates that he wanted a letter of recommendation should he decide to immigrate to the United States some day. *Cf. Matter of H— R—*, 7 I & N Dec. 651, 654 (1958) ("The fact that [an] applicant previously expressed a desire to enter the United States as an immigrant—and may still have such a desire—does not in and of itself preclude issuance of a nonimmigrant visa to him nor preclude his being a *bona fide* nonimmigrant.") (citations omitted).

The BIA also found that Reverend Choe requested his adjustment documents "within weeks of his arrival in the United States and prior to the expiration of the authorized period of his nonimmigrant stay." BIA at 10. The BIA inferred that because all of the supporting adjustment documents submitted by Reverend Choe to establish his ministerial qualifications were dated February 15, 1982, an inference of preconceived intent could be drawn from "the immediacy with which respondent obtained the ... documents." BIA at 10. The evidence does not support this inference.

The uncontradicted evidence is that Bellflower United Church offered Reverend Choe a job about one month after his arrival, or around February 12, 1982. On cross-examination, Reverend Choe asserted that he did not bring the documents dated February 15, 1982, with him from Korea, and he did not attempt to obtain them in December of 1981 or January of 1982. This testimony was not controverted. The BIA did not make a finding regarding Reverend Choe's credibility and therefore he is deemed credible. *Canjura–Flores v. INS,* 784 F.2d 885, 889 (9th Cir.1985) (court will presume IJ and BIA found witness credible where they are silent on the question).

The February 15, 1982, date on the adjustment documents submitted by Reverend Choe does not indicate how quickly Reverend Choe obtained documentation of his ministerial qualifications. It merely shows that the documents attesting to his qualifications were prepared in Korea on February 15, 1982.[23] Reverend Choe's immediate—and successful—effort to obtain documentation to establish his ministerial qualifications for his application for special immigrant minister status and his continued visits to American churches does not support an inference that he misrepresented his intent at the time of entry.[24]

None of the alleged errors in the documents were material to the success of Reverend Choe's adjustment application. Had each alleged discrepancy been discussed with him at his adjustment interview, Reverend Choe would have qualified for permanent residence as a special immigrant minister. Further, the evidence upon which the BIA relied to find material inconsistencies does not logically support an inference of misrepresentation by Reverend Choe. As the IJ correctly found, the American Consul's opinion that Reverend Choe's adjustment of status documentation "was probably fraudulent was not a substitute for actual evidence."

The IJ reasoned that when there is "contravening evidence, especially testimony given *in persona* under oath, then the speculations of the investigative report may not automatically meet the high standard of clear, convincing and unequivocal evidence which is required when the United States is seeking to expel a person from the United States." The IJ's evaluation of the evidence is consistent with the law of this circuit. The translated affidavits attached to the Embassy

Report do not provide "corroborating circumstances which significantly strengthen" the hearsay opinion of the Consul. *Guzman–Guzman v. INS*, 559 F.2d 1149, 1150 (9th Cir.1977). In light of the contradictory testimonial evidence, the Embassy Report is "not sufficiently robust to clear the more demanding barrier of 'reasonable, substantial, and probative'" evidence to support a finding that Reverend Choe's adjustment documents were fraudulent. *Id.* The BIA's finding that the adjustment of status documents are fraudulent on their face is not supported by substantial evidence.

The totality of the evidence introduced by the INS does not constitute convincing, and unequivocal evidence that Reverend Choe entered this country with a preconceived intent to stay here through the use of a fraudulent scheme. To permit so drastic a sanction as deportation, the law requires more than appears in this record. I therefore concur with the judgment of the court that the order granting deportation may not stand.

### III.

### *THE MAJORITY'S PER SE RULE*

The Majority holds that, as a matter of law, "[a]liens who have had their status adjusted pursuant to section 245(a), 8 U.S.C. § 1255(a), cannot later be deported for preconceived intent to remain in the United States at the time of initial entry." Maj. at 930. The Majority also concludes that "this does not mean that aliens who have been adjusted cannot be deported for other immigration violations—violations that are statutory bars to adjustment of status in the first place." *Id.* The Majority reasons that because preconceived intent is no longer a stat-

---

23. In fact, Reverend Choe testified on cross-examination that he could not recall when he received these documents, but he "guess[ed]" in April of 1982.

24. The BIA also noted that scholastic records produced by Reverend Choe at his deportation hearing were dated January 27, 1982. This suggests that Reverend Choe requested school records before receiving an offer of employment from the Bellflower Church. Evidence that Reverend Choe requested documentation relating to adjustment before he received his job offer does not tend to show that he intended to adjust his

status *when he applied for a nonimmigrant visa.* Such evidence might tend to show that at the time he ordered his school records, he was considering the possibility of adjusting his status at some point. A desire to remain in the United States if it is legally possible to do so is not enough to demonstrate preconceived intent. *Bong Youn Choy v. Barber*, 279 F.2d 642, 645–46 (9th Cir.1960). Reverend Choe's request of his school records does not support an inference that he had a preconceived intent to remain in the United States when he first entered this country.

utory bar *to adjustment of status* under section 245 of the Act, the Attorney General's attempt to deport Reverend Choe "entirely negates the Congressional mandate that preconceived intent does not bar nonimmigrant aliens from becoming immigrant aliens." Maj. at 929. I disagree. The 1960 amendment to section 245 removed preconceived intent as statutory bar to *adjustment of status;* it did not eliminate preconceived intent as a basis for deportation at the Attorney General's discretion. Preconceived intent was the statutory ground of exclusion upon which the Attorney General ordered Choe's deportation; the propriety of the deportation order—not the grant of adjustment of status—is the issue presented in this case.

"In all cases involving statutory construction, our starting point must be the language employed by Congress, ... and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *INS v. Phinpathya,* 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984) (internal quotation marks and citations omitted). Nothing in the language chosen by Congress to amend the adjustment of status provisions of section 245 in 1960 evinces any intent to amend the grounds of deportation set forth in section 241(a)(1) of the Act and its related statutory classes of exclusion.

Section 241(a)(1) provided[25] that "[a]ny alien in the United States ... shall, *upon the order of the Attorney General,* be deported who ... at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry ..." 8 U.S.C. § 1251(a)(1) (1988) (emphasis added). At the time of Choe's entry, "any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa" was excludable and ineligible to receive a visa. 8 U.S.C. § 1182(a)(20) (1988) (current version at 8 U.S.C. § 1182(a)(7)(A)(i)(I) (Supp. IV 1992)). The statutory wording of sections 241(a)(1) and 212(a)(20) expressly authorize the Attorney General to exercise her discretion to deport a person, who because of misrepresenting his or her intent to remain perma-

nently in the United States in applying for a visitor's visa, is an immigrant not in possession of a valid unexpired immigrant visa at the time of entry. *See, e.g., Johns v. Department of Justice,* 653 F.2d 884, 889 (5th Cir. 1981) (alien is deportable, upon order of the Attorney General, if he or she enters unlawfully without an immigrant visa in violation of 8 U.S.C. § 1251(a); Attorney General has discretion to refrain from instituting proceedings even though grounds for their commencement may exist).

The 1960 amendment to section 245, 8 U.S.C. § 1255(a), which removed preconceived intent as a statutory bar to *adjustment of status,* in no way affects the Attorney General's discretionary power to deport an "adjusted alien" who entered this country as a visitor with the preconceived intent to remain in the United States permanently. Nothing in the language of the statute, the legislative history, or the case law supports the Majority's contrary view. Therefore, I must respectfully dissent from that portion of the majority opinion holding that the Government is per se barred from deporting an alien for preconceived intent once that alien's status has been adjusted, even if the adjustment is accomplished through affirmative concealment of the preconceived intent, and is not discovered by the INS until after the adjustment of status is granted.

A. *The 1960 Amendment to Section 245(a).*

The Majority concludes that one of the purposes of the 1960 amendment to section 245(a) was to divest the Attorney General of the power to deport an adjusted alien upon discovering, after the adjustment of status, that the alien concealed his or her earlier entry into this country with preconceived intent. Contrary to the Majority's interpretation, the Act provides the Attorney General with the *discretion to deny an adjustment of status* if the alien had a preconceived intent to remain indefinitely in the United States at the time the alien applies for a nonimmigrant visa.[26]

---

**25.** The current version of section 241(a)(1) is set forth, *supra* n. 1.

**26.** In fact, an alien attempting to adjust status could be deported—and even permanently ex-

Prior to the 1960 amendment, section 245(a), 8 U.S.C. § 1255(a), read as follows:

(a) The status of an alien *who was admitted to the United States as a bona fide nonimmigrant* may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence....

8 U.S.C. § 1255(a) (1958) (emphasis added). The 1960 amendment changed the statute to remove the language which I have emphasized above. After 1960, the statute read:

(a) The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence....

8 U.S.C. § 1255(a) (1964). The amended language expanded, rather than limited the Attorney General's discretion. *Castillo v. INS*, 350 F.2d 1, 3 (9th Cir.1965). In *Castillo*, we explained the effect of the amendment in the following passage:

"Congress did not intend to remove from the consideration of the Attorney General the circumstances surrounding the entrance of a nonimmigrant into the United States when passing upon an application under section 245, ... Congress sought to insure that an alien entering the country under circumstances which might have violated the undefined 'bona fide nonimmigrant' standard would not *automatically* be denied a hearing on his application for discretionary relief under the section."

*Id.* (emphasis added); *accord Ameeriar v. INS*, 438 F.2d 1028, 1032 (3d Cir.1971) (en banc) (1958 and 1960 amendments to section 1255 were "intended to increase, not decrease, the scope of the Attorney General's discretion ... [the purpose] was to 'revise section 245 * * * in such a manner as to broaden the discretionary authority of the Attorney General to adjust the status of cer-

tain aliens * * * in worthy cases ... thereby providing considerable more flexibility in the administration of the law.'" (citations and emphasis omitted).

Before 1960, the Attorney General had three options when faced with an adjustment application from an alien who entered under a nonimmigrant visa, but with a preconceived intent to remain here. First, the Attorney General could apply the statutory bar against adjusting an alien with preconceived intent and deny the application for adjustment. Eventually, the alien's nonimmigrant visa would expire. At that point, the alien would have to depart from this country, or face deportation as a nonimmigrant alien with an expired visa. 8 U.S.C. § 1251(a)(9) (1958) (current version at 8 U.S.C. § 1251(a)(1)(C)(i) (Supp. IV 1992)).

Second, the Attorney General could initiate deportation proceedings against the alien pursuant to sections 241(a)(1), 8 U.S.C. § 1251(a)(1) (1958) and 212(a)(19), 8 U.S.C. § 1182(a)(19) (1958), the statutory basis for the fraud allegation in Reverend Choe's deportation order to show cause. An alien who applied for a nonimmigrant visa, but had a preconceived intent to remain in the United States could have been deported under these sections. *See Jain v. INS*, 612 F.2d 683, 689 (2d Cir.1979) (INS was lenient when it merely refused to adjust status of alien who entered with preconceived intent; INS could have initiated deportation proceedings against alien under section 1182(a)(19)), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980); *Cf. Lee v. INS*, 446 F.2d 881, 881–82 (9th Cir.1971) (alien who was refused adjustment based on his preconceived intent was saved from permanent exclusion under section 1182(a)(19) because BIA decision specifically stated that "'the order for petitioner's deportation is not based upon any charge of fraud or misrepresentation.'"); *see also* 2 CHARLES GORDON & STANLEY MAILMAN, IMMIGRATION LAW AND PROCEDURE § 51.01[3] (1993) (["E]ntering the United States [with a

---

cluded—for entering this country as a nonimmigrant with a preconceived intent to remain. 8 U.S.C. § 1251(a)(1) (1988) (current version at 8 U.S.C. § 1251(a)(1)(A) (Supp. IV 1992)); 8

U.S.C. § 1182(a)(19) (1988) (current version at 8 U.S.C. § 1182(a)(6)(C)(i) (Supp. IV 1992)); 8 U.S.C. § 1182(a)(20) (1988) (current version at 8 U.S.C. § 1182(a)(7)(A)(i)(I) (Supp. IV 1992)).

preconceived intent] to apply for adjustment may defeat its purpose; such action ... might involve a material misrepresentation at entry, a permanent ground of inadmissibility.").[27]

Third, under the prior law, the Attorney General could have initiated deportation proceedings against the alien pursuant to section 241(a)(1), 8 U.S.C. § 1251(a)(1) (1958), and section 212(a)(20), 8 U.S.C. § 1182(a)(20) (1958). An alien who applied for a nonimmigrant visa with a preconceived intent to remain in the United States could have been deported under these sections on the basis that his preconceived intent to remain in this country made him an illegal immigrant—not a tourist—at entry. The alien was therefore without a valid immigrant visa at entry.[28] *See Pereira–Diaz v. INS*, 551 F.2d 1149, 1152–53 (9th Cir.1977) (affirming deportation order, based on violation of 1182(a)(20), because of "preformed intent" to remain in the United States); *see also* GORDON & MAILMAN, *supra* § 71.04[2][b] (INS can initiate deportation proceedings under section authorizing exclusion of alien who enters as a nonimmigrant "intending to remain permanently.").

The 1960 amendment merely added a fourth option. Under the 1960 amendment, the Attorney General can choose to forgive the nonimmigrant alien's preconceived intent to remain in the United States at the time of entry and grant an application for adjustment of status. The plain purpose of the amendment was to expand the Attorney General's discretionary authority. The Majority has construed the 1960 amendment to section 245 as evincing Congress' intent to eliminate the Attorney General's discretion under section 241(a)(1) and section 212(a)(20) to deport

aliens whose successful concealment of their preconceived intent resulted in the granting of an application for adjustment of status. The Majority has not presented any support from the legislative history of the 1960 amendment to section 245 for this novel proposition. The case law conclusively demonstrates that the Majority's per se rule is contrary to Congressional intent. If Congress had intended such a drastic limitation on the extensive power delegated to the Attorney General in immigration matters, it would have said so.[29]

Shortly after the 1960 amendment, a number of courts, including this one, determined that the removal of the statutory bar did *not* indicate that Congress intended to eliminate consideration of preconceived intent in the adjustment of status process. *See, e.g., Castillo v. INS*, 350 F.2d 1, 3 (9th Cir.1965); *Ameeriar v. INS*, 438 F.2d 1028, 1032 (3d Cir.1971) (en banc); *Jain v. INS*, 612 F.2d 683, 688 n. 3 (2d Cir.1979) (citing cases). In making this determination, the Second Circuit in *Jain* reasoned that allowing the INS discretion to deny section 245 relief to nonimmigrant aliens who entered in bad faith appeared to comport with the proper administration of the statute. *Jain v. INS*, 612 F.2d at 688 n. 3. To require the INS to disregard a misrepresentation by the nonimmigrant of his true intent "would effectively undercut the Act's requirement that nonimmigrants demonstrate their bona fide status." *Id.* Permitting the INS to deny section 245 relief based on a nonimmigrant's lack of good faith protected the integrity of the consular procedures. *Id. Accord Castillo*, 350 F.2d at 4 ("[f]lagrant disregard of lawful visa procedures must be pertinent to the exercise of discretion under section [245]. Otherwise,

---

**27.** The INS proceeded against Reverend Choe under section 212(a)(19), but instead the INS argued that he had committed fraud in his adjustment, rather than fraud at his entry. The BIA held that section 212(a)(19), 8 U.S.C. § 1182(a)(19) (1988) applies only to fraud at entry.

**28.** This was the basis on which the BIA found Reverend Choe deportable.

**29.** As has occasionally been said about congressional silence in similar contexts, the dog did not bark. *See* ARTHUR C. DOYLE, *Silver Blaze, in*

THE COMPLETE SHERLOCK HOLMES 335 (1927); *Chisom v. Roemer*, —— U.S. ——, ——, 111 S.Ct. 2354, 2364 n. 23, 115 L.Ed.2d 348 (1991) (" 'In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration that a watchdog did not bark in the night' ") (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 602, 100 S.Ct. 1889, 1902, 64 L.Ed.2d 525 (1980)) (Rehnquist, C.J., dissenting).

disregard for the immigration laws would be encouraged.").

Although the question presented in these cases was different from the one we must resolve, the reasoning we employed in *Castillo* is relevant to the issue before us. That rationale is clearly applicable to an alien who, by concealing his preconceived intent, wins a discretionary adjustment of status. To hold that once status is adjusted, the Government is powerless to deport when it discovers that the adjusted alien entered with a preconceived intent to remain permanently can only encourage the flagrant disregard of our immigration laws. The result reached by the Majority is clearly contrary to the grant of discretionary authority to the Attorney General by Congress in the 1960 amendment to section 245.

### B. *Statutory Bars to Adjustment and Deportation.*

The per se rule devised by the Majority precludes deportation of an adjusted alien who entered with the intent to remain permanently. Yet, the per se rule the Majority has decreed does not apply to an adjusted alien subject to deportation "for other immigration violations—violations that are statutory bars to adjustment in the first place." Maj. at 930. This distinction cannot withstand logical analysis.

After today, at least in this circuit, aliens who obtain an adjustment of status by concealing their prior preconceived intent at entry are immunized from deportation for violating section 212(a)(20), 8 U.S.C. § 1182(a)(20) [30]. If, however, the alien conceals a prior entry by fraudulent or willful misrepresentation of a material fact in violation of section 212(a)(19), 8 U.S.C. § 1182(a)(19),[31] and obtains an adjustment of status, the INS, upon discovery, may deport. The Majority has not articulated a rational basis for granting immunity from deportation only to the adjusted alien who conceals his prior preconceived intent, but not to one who conceals his or her fraud or misrepresentation of a material fact regarding the entry or procurement of a visa or other documentation. Fraud and preconceived intent are statutory exclusions, 8 U.S.C. § 1182(a)(19–20), that render an alien deportable under section 241(a)(1), 8 U.S.C. § 1251(a)(1). That fraud is a statutory bar to *adjustment of status* while preconceived intent is but a factor that may bar *adjustment of status* has nothing to do with the statutory grounds for *deportation.*

The Majority's attempt to distinguish the law of this Circuit as set forth in *Monet v. INS,* 791 F.2d 752 (9th Cir.1986) and *Oloteo v. INS,* 643 F.2d 679 (9th Cir.1981) is unpersuasive. In both cases, we rejected the argument that the five year statute of limitations imposed on rescission of adjustment of status proceedings by section 246, 8 U.S.C. § 1256(a), also applied to deportation proceedings. In *Oloteo,* we noted that the Supreme Court has " 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " 643 F.2d at 681 (citation omitted). We refused to meddle in the decision of Congress to do away with statutes of limitations in deportation proceedings for immigration law violations.

The aliens in *Oloteo* had been admitted as lawful permanent residents. *Id.* at 680. They were deported on the basis that their entry visas were obtained by fraud in violation of sections 241(a)(1), 8 U.S.C. § 1251(a)(1) and 212(a)(19), 8 U.S.C. § 1182(a)(19). They did not challenge the evidence of fraud at the deportation hearing. *Id.* & n. 2. Pedro Oloteo was admitted as a lawful permanent resident because he claimed status as an unmarried child of a lawful permanent resident. *Id.* at 680. Two years later, Myrna Oloteo was granted preference status as his wife; the marriage allegedly occurred subsequent to Pedro's entry. *Id.* After Myrna immigrated to the United States as a permanent resident, the INS discovered that the couple already had been married prior to Pedro's immigration. Deportation proceedings were instituted. *Id.*

---

**30.** The text of section 212(a)(20) is set forth, *supra* n. 2.

**31.** The text of section 212(a)(19) is set forth, *supra* n. 5.

The Oloteos did not contest the factual finding of fraud on appeal, but contended that the five year limitations period applicable to rescissions of adjustment of status should apply to their deportation proceedings. *Id.* & n. 2. In rejecting their contention, we reasoned that "Congress has seen fit to do away with statutes of limitation with regard to deportation proceedings, but in its wisdom has engrafted such a limit to the rescission of status proceeding alone." *Id.* at 683.

In *Monet v. INS,* 791 F.2d 752 (9th Cir. 1986), the alien concealed his prior narcotics conviction when he first entered the United States and when he later sought adjustment of status to permanent resident alien. We held that the statutory limitations period applicable to rescission proceeding does not apply to bar deportation proceedings against an adjusted alien. We explicitly extended *Oloteo* "to exclude application of the five year limitations period to deportation proceedings *regardless of the method of the alien's admission." Id.* at 754 (citation omitted) (emphasis added). We again refused to tamper with Congressional intent, declining to "add to the law what Congress has plainly excluded." *Id.* (citation omitted).

The Majority argues that *Monet* and *Oloteo* are inapplicable here because the violations of law that rendered the adjusted aliens deportable in these cases were also "statutory bars to becoming a legal permanent resident." Maj. at 930. The Majority reasons that, since preconceived intent is not a statutory bar to adjustment of status, but a discretionary factor, deportation based on preconceived intent is reinstatement of "the statutory bar removed by Congress." Maj. at 930.

The Majority's analysis is contrary to the express grant of discretionary power to the Attorney General to deport aliens who have misrepresented their intentions in applying for a visitor's visa. The distinction between statutory bars and discretionary factors in determining whether to grant an adjustment of status has no application in resolving whether the Attorney General has the power to deport an adjusted alien upon discovery that he or she would have been excludable at the time of initial entry because of preconceived intent. Under the Majority's per se rule, the Attorney General can deport an alien for preconceived intent *before,* but not *after,* adjustment of status pursuant to section 212(a)(20), 8 U.S.C. § 1182(a)(20).

In both *Monet* and *Oloteo,* however, deportation proceedings occurred *after* adjustment of status (*Monet* ) and after the grant of lawful permanent resident status (*Oloteo* ) because the prior "violation" of law was concealed at the time the alien's status was adjusted. Thus, the Majority's holding is contrary to the law of this circuit. The Majority has not set forth any authority that support its view that the power of the Attorney General to deport is restricted after adjustment of status where aliens conceal their preconceived intent at the adjustment of status proceedings. The purpose of the 1960 amendment—to broaden the discretion of the Attorney General—is utterly defeated by a rule that an alien can escape deportation if his or her preconceived intent to remain permanently in the United States upon initial entry as a visitor is concealed until after his or her application for adjustment of status has been granted.

### C. *Disparate Consequences of Deportation.*

The Majority reasons that the limitation on the Attorney General's power it has created is appropriate because of the disparate consequences of concealment under 8 U.S.C. § 1251(a)(1), and 8 U.S.C. § 1182(a)(20). The Majority notes that an alien with a past drug conviction who entered the United States and applied for adjustment of status would be excludable pursuant to 8 U.S.C. § 1251(a)(1). The alien also would be unable to receive an immigrant visa in his or her country of origin because of the drug offense. An alien who entered the United States as a visitor with preconceived intent to remain permanently and applied for adjustment of status also would be excludable pursuant to 8 U.S.C. § 1182(a)(20). Under these facts, however, the alien would be able to obtain an immigrant visa overseas if he or she was denied adjustment of status. Maj. at 930.

The fact that Reverend Choe could have returned to Korea and reapplied as an immigrant if his application for adjustment of status had been denied has no relevance to the question presented in this appeal, i.e., whether Congress gave the Attorney General the power to deport an alien upon discovery of his or her misrepresentation. The words used by Congress in authorizing the Attorney General to decide whether a preconceived intent should bar *adjustment of status* are free from any ambiguity.

Assuming arguendo (1) that the INS met its burden of proving by clear, convincing and unequivocal evidence that Reverend Choe misrepresented his intent at the time of entry, and (2) that his true intent had been discovered *prior* to the grant of Reverend Choe's application for adjustment of status, the Attorney General would have had four options: (1) refuse to adjust his status, (2) adjust his status, (3) initiate deportation proceedings under 8 U.S.C. § 1182(a)(19), (4) initiate deportation proceedings under 8 U.S.C. § 1182(a)(20). Had the Attorney General proceeded against Reverend Choe under options 3 or 4, Reverend Choe would have been either permanently excludable under option 3, 8 U.S.C. § 1182(a)(19), or excludable for five years under option 4. 8 U.S.C. § 1182(a)(17) (1988) (current version at 8 U.S.C. section 1182(a)(6)(B) Supp. IV 1992)).

The Majority also reasons that "[a]liens who obtain adjusted status have a legitimate expectation that their immigration will be permanent." Maj. at 930. I disagree. A person who enters by concealing his or her true intent has no entitlement to a waiver of the requirements of our immigration laws. Contrary to the Majority's conclusion, the fact that the Attorney General could exercise her discretion under these options to refuse adjustment of status does not result in the restoration of the statutory bar against adjusting an alien with preconceived intent. The Attorney General could have exercised her discretion to adjust Reverend Choe's status even if convinced that he had misrepresented his intention in his application for a visitor's visa. Likewise, the Attorney General's power to deport an alien upon discovery that the adjusted alien misled the Government by disguising his preconceived intent is not a restoration of the statutory bar to adjustment. The Attorney General retains the discretion to initiate deportation proceedings or to take no action against the alien.

The Majority's creation of the per se rule is tantamount to judicial legislation. The Majority has ignored circuit law binding on this panel, which holds that whether an alien's status has been adjusted is irrelevant to the question whether deportation proceedings may be initiated. *Monet,* 791 F.2d at 754. "The implementation of [the Immigration and Naturalization Act] is an exercise left to the wisdom and authority of the political branches of government, which function has long been recognized by the judiciary as largely immune from court control." *Oloteo,* 643 F.2d at 680 (citations omitted). Particularly in the arena of immigration—where the power of Congress is plenary—courts must avoid making law based on idiosyncratic notions of fair play. If a proper reading of the statute and the case law results in unfairness, then that "argument ... would best be made before Congress and the Attorney General." *Id.* at 683.

In this matter, the INS was not aware, at the adjustment of status proceedings, that Reverend Choe may have concealed his intent to remain in the United States at the time of his entry. No showing has been made that the INS engaged in affirmative misconduct in approving Reverend Choe's adjustment of status. *See Watkins v. United States Army,* 875 F.2d 699, 706–07 (9th Cir. 1989) (government not estopped by mere negligence; estoppel requires affirmative misconduct resulting in serious injustice that will not cause undue damage to public's interest), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). The INS may have been negligent in failing to pursue the investigation of Reverend Choe's alleged misrepresentation at an earlier date. Neither Congress nor this circuit has suggested that the INS loses its power to deport because it has been negligent in pursuing an investigation. *Santiago v. INS,* 526 F.2d 488, 491 (9th Cir.1975) (en banc) (estoppel is available in immigrations cases, but even where offi-

cials act in derogation of a duty estoppel not warranted; therefore estoppel is not applicable if no derogation of duty), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The INS has no duty to institute deportation proceedings at any prescribed time. There is no statute of limitation on the exercise of the Attorney General's discretionary power to order deportation. *Oloteo,* 643 F.2d at 682–83 ("Congress has seen fit to do away with statutes of limitation with regard to deportation proceedings ...") (footnote omitted).

The Majority's per se rule bars deportation of those who have successfully misrepresented their true intent to flout our immigration laws to jump to the head of the long line of persons trying lawfully to enter this country. I am not persuaded that Congress intended to reward aliens who obtain entry through fraud by successfully concealing their deceit until after they have obtained adjustment of status.